# ORIGINAL

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** *ex rel.* **KATLISA N. VAUGHN, STATE OF FLORIDA** *ex rel.* **KATLISA N. VAUGHN, STATE OF GEORGIA** *ex rel.* **KATLISA N. VAUGHN, STATE OF NEW YORK** *ex rel.* **KATLISA N. VAUGHN, STATE OF TENNESSEE** *ex rel.* **KATLISA N. VAUGHN, and STATE OF TEXAS** *ex rel.* **KATLISA N. VAUGHN** | * * * * * * * * * * * | **CIVIL ACTION**<br><br>**FILE NO.** _____<br><br><br><br>**FILED UNDER SEAL PURSUANT TO 31 U.S.C. § 3730(b)(2)** |
| **Plaintiffs and Relator,** | * * | |
| **v.** | * * | **JURY TRIAL DEMANDED, Pursuant to Fed. R. Civ. P. 38** |
| **MEDICAL BUSINESS SERVICE, INC.** | * * | |
| **Defendant.** | * * * | |

## COMPLAINT

Katlisa N. Vaughn ("Relator") brings this action on behalf of the United

States of America and the states of Florida, Georgia, New York, Tennessee, and

Texas to recover damages and civil monetary penalties arising from Medical

Business Service, Inc.'s ("MBS") violations of the federal False Claims Act, 31

U.S.C. §§ 3729–3733 ("FCA"), as well as the following state false claims statutes:

797833.1

(1) the Florida False Claims Act, Fla. Stat. Ann. §§ 68.081–.092; (2) the Georgia State Medicaid False Claims Act, O.C.G.A. §§ 49-4-168.1–.6; (3) the New York False Claims Act, New York State Fin. Law §§ 187–194; (4) the Tennessee Medicaid False Claims Act, Tenn. Code Ann. §§ 71-5-181 to 71-5-185; and (5) the Texas False Claims Act, Tex. Hum. Res. Code §§ 36.001–.132.

## SUMMARY OF MBS'S FALSE CLAIMS

1.

MBS is a medical billing company that has violated the FCA and multiple state false claims statutes by falsifying diagnosis codes on denied medical claims and resubmitting those falsified claims to Medicare, Medicaid, and multiple other government-funded health care programs (collectively, "Government Health Care Programs"). MBS has encouraged, directed, and concealed its illegal actions through the following three categories of misconduct:

(a)     Billing Procedures Designed to Thwart Coverage Limitations: MBS has devised its billing procedures to circumvent Government Health Care Program coverage restrictions. MBS requires its employees to review every claim denied on medical necessity grounds—that the service performed was not medically necessary for the reported diagnosis—to consider whether the diagnosis code should be changed and the claim resubmitted for payment.

Importantly, MBS assigns this task to entry-level employees who receive no training in coding or medicine and have little or no access to patient medical records, conducts no review of the altered codes before the claims are resubmitted, and imposes significant pressure on all of its employees to improve collection rates.

(b)   <u>Management Directives to Falsify Diagnosis Codes</u>: Numerous MBS managers have repeatedly directed their subordinates to alter diagnosis codes on multiple denied claims without access to any patient medical records.

(c)   <u>No Meaningful Compliance Program to Prevent or Detect False Claims</u>: MBS has failed and refused to adopt basic, common, and well-known compliance measures that would likely detect, expose, and terminate MBS's fraudulent coding practices and scheme to submit falsified medical claims.

## JURISDICTION & VENUE

2.

The Court has subject matter jurisdiction over this action pursuant to the following: (1) 28 U.S.C. § 1331, which confers jurisdiction on this Court for civil actions arising under federal statutes; (2) 31 U.S.C. § 3732(a), which expressly confers jurisdiction on this Court for actions brought under the FCA; and (3) 31

797833.1

U.S.C. § 3732(b), which provides supplemental jurisdiction over state law claims seeking the recovery of funds paid by state or local governments if those claims arise from the same transactions or occurrences as accompanying federal FCA claims.

3.

This action is not subject to 31 U.S.C. § 3730(b)(5)'s *first-to-file* restriction because the false claims allegations in this Complaint are not based on the facts underlying a pending FCA action. Likewise, this action is not subject to 31 U.S.C. § 3730(e)(4)(A)'s *public disclosure* limitations because the allegations and transactions in this action have not been publicly disclosed (1) in a federal criminal, civil, or administrative hearing in which the government or its agent is a party, (2) in a congressional, Government Accountability Office, or other federal report, hearing, audit, or investigation, or (3) through the news media. Moreover, if there has been a prior public disclosure of any of the allegations or transactions alleged in this action through one of the above-referenced categories of proceedings or sources, Relator qualifies as an "original source" of such information, pursuant to 31 U.S.C. § 3730(e)(4)(B).

4.

The Court has personal jurisdiction over Defendant MBS pursuant to 31

797833.1

U.S.C. § 3732(a), which provides that "[a]ny action under section 3730 may be brought in any judicial district in which the defendant or, in the case of multiple defendants, any one defendant can be found, resides, transacts business, or in which any act proscribed by section 3729 occurred." Section 3732(a) also authorizes nationwide service of process. At all times relevant to this action, up to and including the date of this filing, Defendant MBS has resided and transacted business in the Northern District of Georgia. In addition, MBS has committed numerous FCA violations in the Northern District of Georgia, as more particularly described herein.

5.

Venue is proper in this Court pursuant to the following: (1) 28 U.S.C. 1391(c), because Defendant MBS resides in the Northern District of Georgia, in that MBS has contacts in the district that would be sufficient to subject it to personal jurisdiction if the district were a separate state; and (2) 31 U.S.C. § 3732(a), because MBS can be found, transacts substantial business, and has committed numerous FCA violations, within the Northern District of Georgia.

## THE PARTIES

## DEFENDANT MEDICAL BUSINESS SERVICE, INC.

6.

Defendant Medical Business Service, Inc. is a privately owned medical billing company that prepares and submits medical claims for physician practices. MBS's clients are primarily large (10 to 35 doctors) hospital-based radiology and pathology groups. MBS submits these claims to Government Health Care Programs and private insurers.

7.

Upon information and belief, MBS charges each of its client practices a fee for its billing services that is comprised of two components: (1) a flat monthly service fee; and (2) a variable fee based upon a percentage of the funds MBS collects for the practice.

8.

MBS currently provides billing services for several hundred physicians within 35 practices, which are located across the following 7 states: Georgia, Florida, Kentucky, Louisiana, New York, South Carolina, and Texas. At various times within the past 6 years, MBS has also submitted bills for practices located in 3 additional states: Arkansas, Ohio, and Tennessee.

797833.1

9.

MBS currently employs roughly 230 employees, who work in one of the company's 7 offices, which include the company's (1) Coral Gables, Florida headquarters, (2) Duluth, Georgia operations center, and (3) 5 branch offices. MBS has assigned the billing services for each of its 35 client practices to one of these 7 offices.

10.

MBS is incorporated in Florida and maintains its corporate headquarters and principle executive offices at 2555 Ponce De Leon Blvd. Suite 400, Coral Gables, Florida.  MBS's Coral Gables headquarters provides billing services for the following 7 company clients: (1) Endovascular Therapy Associates, (2) MRI Associates of Miami, (3) PVC Associates Cedars, (4) PVL Associates, (5) Radiology Associates of South Florida, (6) South Florida Medical Imaging, and (7) South Miami Blood Flow.

11.

In mid-2009, MBS consolidated a number of its former branch offices into a large 20,000 square foot operations center located at 3555 Koger Blvd. NW, Duluth, Georgia 30096.  Currently, over 120 MBS employees (a majority of the company's workforce) process and submit medical bills for 18 of MBS's client

practices (a majority of the company's clients) from its Duluth operations center. While the company hired and trained about 55 new, entry-level employees to work at its Duluth center when it was opened, the majority of the MBS employees at the location (including all 8 executives holding the positions of Director or Manager) were existing MBS employees who transferred from other MBS offices as part of the consolidation. MBS's Duluth operations center provides billing services for the following 18 company clients: (1) Accu Site, (2) Carmona Pathology Associates, (3) Central Georgia MRI, LLC, (4) Central Georgia P.E.T., LLC, (5) Diagnostic Imaging, P.A., (6) Gardens Radiology Associates, (7) Georgia Magnetic Imaging, (8) Imaging Consultants of South Florida, (9) Medical Imaging Professionals, (10) North Metropolitan Radiology, (11) Park Avenue Associates of Radiology, (12) Pathology Lab Diagnostics, (13) Radcare, (14) Radiology Associates of Atlanta, (15) Radiology Associates of Macon, (16) Radiology Associates of Rockledge, (17) Southern Tier Imaging Center, and (18) St. Johns Radiology.

12.

MBS services its remaining 10 client practices from the following 5 branch offices: (1) an Athens, Georgia office, which services 2 practices; (2) a Charleston, South Carolina office, which services 2 practices; (3) an Edgewood, Kentucky

office, which services 2 practices; (4) a Milton, Florida office, which services 1

practice; and (5) a Baton Rouge, Louisiana office, which services 3 practices.

## RELATOR KATLISA VAUGHN

### Vaughn's Background and
### Current Position at MBS

13.

Relator Katlisa N. Vaughn is currently employed by MBS as an Account

Representative II at the company's Duluth, Georgia operations center.  In this

position, Vaughn is responsible for (1) receiving claims that have been denied by

Government Health Care Programs and private insurance companies; (2)

determining why those claims were denied; (3) resubmitting a subset of the denied

claims after identifying and addressing issues that caused the denial of otherwise

legitimate and proper claims; and (4) adjusting (writing-off) claims that were

properly denied.  This process normally includes (1) correcting data entry errors in

the claim information (*e.g.*, inaccurate treatment dates or patient demographic

information) by referencing other accurately entered information from the file or

(2) revising the method of submission  (*e.g.*, a paper claim was submitted to a

payer that accepts only electronic claims).  At any given time, Vaughn is

797833.1

9

responsible for processing approximately $8 million in rejected or miscoded claims.

14.

Vaughn started in her position at MBS on August 17, 2009, after holding numerous administrative positions in the insurance industry. A 31 year old single mother of 3 young boys, Vaughn earned an Associates degree in Business in 2008 and is scheduled to graduate with a Bachelors degree in Human Service Management in December, 2010. Vaughn is a resident of Stone Mountain, Georgia.

### Vaughn Has an Insider's Perspective on MBS's Ongoing Illegal Coding Practices

15.

Vaughn has been well-situated within MBS to observe, identify, and chronicle the company's pervasive practice of fabricating diagnosis codes on physician claims to extract improper payments from Government Health Care Programs.

16.

Working in MBS's Duluth operations center, Vaughn has regular contact with virtually all 120 MBS employees located at the center, and she observes the

work performed by, and interactions among, these workers on a daily basis. From this vantage, Vaughn routinely observes MBS management directing and pressuring their subordinates (herself included) to falsify diagnosis codes on denied medical claims. In most of these cases, the new diagnosis codes are not supported by any clinical medical records available to MBS, and the employees who are being directed to alter the codes have no training in coding and no medical experience. Indeed, Vaughn has observed certain employees on numerous occasions changing all the diagnosis codes for every claim in a stack of denied claims without reference to any medical records, using no more than a small commercially published ICD-9-CM code book.

17.

As an Account Representative II, Vaughn has become very familiar with the following: (1) the procedures for submitting claims for payment and the *appropriate* procedures for managing denied claims by (a) correcting discrete, non-substantive errors in otherwise legitimately payable claims before resubmission for payment, (b) seeking payment from the patient (if the patient signed an Advanced Beneficiary Notice), and/or (c) adjusting (writing-off) those claims that have been properly denied; and (2) the structure and operation of MBS's medical billing

computer system (a software and database platform known as "MED/FM") as well as the categories of information stored on the system.

18.

Because Vaughn understands the proper procedures for processing denied claims and understands MBS's MED/FM computer system, she can identify, with a high level of confidence, claims in the MED/FM system with diagnosis codes that MBS employees have falsified.  Vaughn can identify these alterations based on the information in each claim's "Account History," "Patient Notes," and "History of Transaction Changes" data fields.

19.

In addition, MBS's MED/FM computer system provides Vaughn complete access to the company's billing records for 25 of the company's 35 client practices. These 25 practices include all 18 practices serviced at MBS's Duluth operations center as well as the 7 practices serviced at MBS's Coral Gables headquarters. Vaughn's broad access to MBS's own records has allowed her to identify a widespread pattern of similar fraudulent coding and billing practices throughout the company.

**LEGAL AUTHORITY**

## THE FEDERAL FALSE CLAIMS ACT
## (31 U.S.C. §§ 3729 – 3733)

20.

Katlisa Vaughn has brought this action under, *inter alia*, the federal FCA on behalf of the United States to recover damages and civil monetary penalties from MBS for the fraudulent conduct detailed herein.  The FCA is the primary law on which the federal government relies to recover losses caused by fraud.  *McNutt ex rel. United States  v. Haleyville Med. Supplies*, 423 F.3d 1256 (11th Cir. 2005).

21.

The FCA's primary substantive sections prohibit persons, acting with knowledge, deliberate ignorance, or reckless disregard, from presenting or causing to be presented a false or fraudulent claim for payment or approval to (1) the federal government, or (2) a third-party recipient of federal government money if the money or property requested from the third-party was provided by the federal government and is to be spent or used on the government's behalf or to advance a government program or interest.  31 U.S.C. § 3729(a)–(b).  The FCA also prohibits conspiring to violate the statute's substantive provisions.  31 U.S.C. § 3729(a)(1)(C).  Persons violating the FCA are liable for (a) 3 times the amount of the damages sustained by the government and (b) a civil penalty ranging from

797833.1

13

$5,500 to $11,000 for each such claim. *See* 31 U.S.C. § 3729(a); 28 C.F.R. § 85.3(a)(9).

## FCA's History, Purpose, and Provisions

### 22.

Originally enacted in 1863 in response to widespread corruption, fraud, and misuse of federal funds during the Civil War, the FCA was weakened by a 1943 amendment which considerably decreased the statute's application and the frequency of its use. *See* 132 CONG. REC. H6474 (Sept. 9, 1986) (statement of Rep. Glickman). However, in response to a wave of procurement scandals in the mid-1980s, Congress substantially amended the FCA in 1986 to provide more effective means of identifying, stopping, and remedying fraud against the government. *Id.* Among other things, the 1986 amendments (1) reduced the burden of proof (to a preponderance standard), 31 U.S.C. § 3731(d); (2) lowered the *mens rea* requirement (reducing it to reckless disregard of the truth or falsity of the submitted claim), § 3729(b)(1)(A); (3) increased the available damages and penalties (imposing treble damages and civil monetary penalties), § 3729(a); and (4) extended the statute of limitations (providing between 6 and 10 years to file an action), § 3731(b). *See generally*, Pub. L. 99-562, 100 Stat. 3153 (1986); Pub L. 103-272, 108 Stat. 1362 (1994). The FCA was further strengthened in 2009 and

2010 to clarify the statute's application to false claims submitted to private contractors working on government projects and limit the scope and effects of the statute's public disclosure bar. *See* Fraud Enforcement and Recovery Act, Pub. L. No. 111-21, 123 Stat. 1617 (2009) (amending 31 U.S.C. §§ 3729-3733); Patient Protection and Affordable Care Act, Pub. L. No. 111-148, 124 Stat. 119 (2010) (amending 31 U.S.C. § 3730(e)(4)).

23.

The 1986 FCA amendments also increased the incentives for private whistleblowers to invest their own time and resources into uncovering, reporting, and pursuing FCA violations. Under certain circumstances, these whistleblowers (known as "relators") may bring civil FCA actions (known as "*qui tam*" suits) on behalf of the United States to recover damages and penalties. *See* 31 U.S.C. § 3730(b). Relators who bring successful *qui tam* actions may receive a percentage (normally between 15% – 30%) of the government's recovery.

**FCA *Qui Tam* Suits Have Recovered Billions
Stolen from the United States and Federal Health Care Programs**

24.

Since the FCA's 1986 amendments became effective, private *qui tam* actions have comprised a sizable majority of new FCA matters (including referrals,

investigations, and filed cases) reported by the United States Department of
Justice.  More particularly, *qui tam* actions comprised 62.2% of all new FCA
matters (6,628 out of 10,650 matters) between October 1, 1986 and September 30,
2009.  During the same period, *qui tam* actions were responsible for an even higher
percentage of overall FCA recoveries through judgments or settlements,
accounting for 65.1% of all FCA damages and penalties recovered from defendants
($15,658,403,837 out of $24,056,382,238).

25.

*Qui tam* actions have been particularly effective in identifying fraud against
the government in the health care industry.  In FCA health care cases (like this
action) brought during the same 23-year period, *qui tam* actions and recoveries
comprised even larger shares of all claims brought, 84.4% of all the new FCA
matters reported by the Department of Health and Human Services (3,587 out of
4,248 matters) and judgments/settlements paid by defendants, 72.2% of all the
recoveries from FCA defendants in health care cases ($11,506,614,307 out of
$15,943,495,594).

## THE MEDICARE AND MEDICAID STATUTES
### (42 U.S.C. §§ 1395 - 1395ccc, 1396 - 1396v)

26.

The Medicare and Medicaid programs were created through 1965

amendments to the Social Security Act, which added Title XVIII (Medicare) and

Title XIX (Medicaid) to the Act.  Pub. L. No. 89-97, 79 Stat. 286 (1965).  In 2009,

the Medicare and Medicaid programs covered a combined 100 million Americans

(one-third of the U.S. population), and the federal government's gross spending on

these programs totaled more than $750 billion.  *See* Cong. Budget Office, The

Long-Term Budget Outlook at 30 (2010) (available at

http://www.cbo.gov/ftpdocs/115xx/doc11579/06-30-LTBO.pdf) (hereinafter

"CBO").  The Congressional Budget Office projects that federal outlays for these

programs will increase at an average rate of roughly 7 percent a year between 2011

and 2020.  *Id.* at 2.

### The Medicare Program
### (MBS Submits Claims Under Medicare Parts B and C)

27.

Medicare is a federally funded and federally administered nationwide social

health insurance system for Americans age 65 and older, and for younger adults

with permanent disabilities.  In 2009, the Medicare program covered 46.3 million

797833.1

17

elderly and disabled Americans and paid $502 billion in benefits, *see* Bd. of Trs. of

the Fed. Hosp. Ins. and Fed. Supplementary Med. Ins. Trust Funds, 2010 Annual

Report at 5 (2010) (available at

https://www.cms.gov/ReportsTrustFunds/downloads/tr2010.pdf), making it the

largest single purchaser of health care in the United States, *see* CBO at 29.

28.

The Medicare program contains 4 main components: Parts A, B, C, and D.

This action primarily concerns claims submitted by MBS under Parts B and C.

29.

Part B (known as Supplemental Medical Insurance), mainly covers

outpatient hospital care, physician visits, ambulance services, clinical laboratory

services, diagnostic radiological testing, and durable medical equipment.  The

radiology and pathology practices that comprise MBS's client-base provide, *inter*

*alia*, the following services covered by Part B: (1) outpatient hospital services and

supplies incident to physician services, 42 C.F.R. § 410.27; (2) diagnostic services

furnished to outpatients by or under arrangements made by a hospital, 42 C.F.R. §

410.28; (3) diagnostic laboratory and x-ray tests, 42 C.F.R. § 410.32; and (4) x-ray

therapy and other radiation therapy services, 42 C.F.R. § 410.35.

30.

MBS submits claims under Medicare Part B to Medicare Administrative Contractors (formerly known as Medicare Carriers) for the services provided by its client practices. The current Medicare Administrative Contractors covering the 10 states in which MBS's clients have practiced in the last 6 years are as follows: (1) Cahaba Government Benefit Administrators, LLC, which covers Georgia and Tennessee; (2) First Coast Service Options, Inc., which covers Florida; (3) Highmark Medicare Services, Inc., which covers Kentucky and Ohio; (4) National Government Services, which covers New York; (5) Palmetto Government Benefits Administrator, LLC, which covers South Carolina; (6) Pinnacle Business Solutions, Inc., which covers Louisiana and Arkansas; and (7) TrailBlazer Health Enterprises, which covers Texas.

31.

Part C (known as Medicare Advantage) subsidizes beneficiaries' enrollment in private managed care programs (HMOs) that generally provide all, if not more, of the coverage available through both Parts A and B in exchange for monthly premium payments. In general terms, Medicare pays the HMO a flat monthly fee for each beneficiary enrolled in the program, and that flat fee provides all Medicare reimbursement for all care provided to the program beneficiary. At set intervals

(usually annually), Medicare's monthly payment per enrolled patient is adjusted based on the cost incurred by the HMO.

32.

While MBS submits claims under Medicare Part C to the private companies operating Medicare Advantage HMOs, these claims are covered by the FCA because they (1) directly seek funds provided by the federal Medicare program for the purposes of advancing a federal government program or interest, and (2) inflate these HMOs costs reports to the Medicare program and thereby raised Medicare's monthly payments to the HMOs.

33.

MBS submits claims on behalf of its client practices to at least the following 27 Medicare Advantage HMOs: (1) Advantra Freedom, (2) Aetna, (3) AmeriChoice, (4) Aultcare, (5) Blue Cross Blue Shield Smart Value, (6) Care Improvement Plus, (7) Cigna Medicare Access, (8) Deseret Mutual, (9) Evercare/UHC, (10) Health First, (11) Health Markets Care Assured, (12) Health Net, (13) Health Spring, (14) Humana Gold, (15) InStil Health, (16) Kaiser Permanente, (17) Neighborhood Health, (18) Pacificare, (19) Passport Advantage, (20) Preferred Care, (21) Pyramid Life/Benefit, (22) Secure Horizons/UHC, (23)

Senior Choice, (24) Sterling Investor, (25) Sterling Option, (26) Universal

Healthcare, (27) Vista Health Plan, and (28) Wellcare.

### The Medicaid Program
### (MBS Submits Claims to State
### Medicaid Programs and Medicaid MCOs)

34.

Medicaid is a joint federal/state program that pays for health care services

for a variety of low-income individuals.   The Federal Medicaid Statute, 42 U.S.C.

§§ 1396 - 1396v, offers federal matching funds to states that establish Medicaid

plans providing certain vulnerable populations with access to basic health care.

The Medicaid system is overseen by the Secretary of Health and Human Services,

but separate Medicaid agencies and directors administer the programs within each

state.  All fifty states have created Medicaid programs, which collectively cover

about 58 million low-income Americans at any one time.  CBO at 31.

35.

The state Medicaid programs are jointly financed by the federal and state

governments.  In general, the federal government pays between 50% and 83% of

the cost of health care provided through each state program, and the federal

government contributed $251 billion to these programs in 2009, *see* CBO at 29-30.

The percentage allocated to the federal government (known as the "Federal

Medical Assistance Percentage" or "FMAP") is determined separately for each state—based upon that state's per capita income—and is recalculated annually. In addition, the American Recovery and Reinvestment Act of 2009 provided a temporary 6% enhancement of the federal government's FMAP contribution in each state, which is scheduled to expire on September 30, 2010.

36.

For the fiscal years 2010 (October 1, 2009 – September 30, 2010) and 2011 (October 1, 2010 – September 30, 2011) the unenhanced FMAPs for the 7 states in which MBS currently submits Medicaid claims have been set at the following percentages:

(1) Florida (2010: 54.98%; 2011: 55.45%);

(2) Georgia (2010: 65.10%; 2011: 66.33%);

(3) Kentucky (2010: 70.76%; 2011: 71.49%);

(4) Louisiana (2010: 67.61%; 2011: 63.61%);

(5) New York (2010: 50%; 2011: 50%);

(6) South Carolina (2010: 70.32%; 2011: 70.04%); and

(7) Texas (2010: 58.73; 2011: 60.56%).

37.

States primarily deliver health care services to Medicaid beneficiaries

through either (1) fee-for-service systems, in which the state Medicaid programs pay individual providers for each service furnished; or (2) a variety of managed care models, most of which involve paying managed care organizations fixed monthly capitation rates for each enrollee to provide a defined set of Medicaid-covered, basic health care services and to coordinate and authorize specialty care furnished by other physicians on a fee-for-service basis.

38.

During the last 6 years, MBS has submitted claims on behalf of its clients for services provided to patients covered by Medicaid programs in at least the 10 states where those practices have been located (*i.e.*, Arkansas, Georgia, Florida, Kentucky, Louisiana, New York, Ohio, South Carolina, Tennessee, and Texas). These claims have been sent either (1) to the state Medicaid programs through each state's designated Medicaid fiscal agent (such as HP Enterprise Services, which replaced Affiliated Computer Services as Georgia's Medicaid fiscal agent in June 2010); or (2) to managed care organizations that have contracted with these states to provide health care to their Medicaid beneficiaries (such as Georgia's three Medicaid managed care contractors: Amerigroup, Peach State Health Plan, and Wellcare).

## OTHER GOVERNMENT-FUNDED
## HEALTH CARE PROGRAMS

### (MBS Submits Claims to the TRICARE,
### VHA, CHAMPVA, and FEHBP Programs)

39.

TRICARE, formerly known as the Civilian Health and Medical Program of

the Uniformed Services (CHAMPUS), is a health care program of the United

States Department of Defense Military Health System.   TRICARE provides

civilian health benefits for military personnel, military retirees, and their

dependents.  The TRICARE program is managed by TRICARE Management

Activity under the authority of the Assistant Secretary of Defense, and it is funded

by the federal government.  MBS submits claims to TRICARE through the two

companies that administer the program's North and South Regions: Health Net

Federal Services and Humana Military Healthcare Services, respectively.  During

the last six years, all MBS client practices have been located in these two

TRICARE regions.

40.

The Veterans Health Administration (VHA) is the branch of the U.S.

Department of Veterans Affairs that purchases coverage for, and delivers health

care to, veterans and dependents.  The VHA operates the nation's largest integrated

797833.1

24

health care system, and provides care to over 5 million inpatients and outpatients at

its network of hospitals, outpatient clinics, nursing homes, residential rehabilitation

treatment programs, and readjustment counseling centers.  While the majority of

VHA-covered services are provided at VA facilities, the program also covers care

provided by non-VA physicians (including MBS clients) in non-VA facilities

under certain circumstances (*e.g.*, emergency care provided to stabilize VHA

beneficiaries to the point that they can be transferred to an approved VA facility).

MBS submits claims to the VHA at one or more of the program's 10 regional fee

offices.

41.

The Civilian Health and Medical Program of the Department of Veterans

Affairs (CHAMPVA) is a health care program for the families of veterans with

permanent service-connected disabilities.  The program is administered by the

Health Administration Center within the Department of Veterans Affairs, and the

program is funded by the federal government.  MBS submits claims to

CHAMPVA at the VA Health Administration Center in Denver, Colorado.

42.

The Federal Employee Health Benefit Program (FEHBP) provides health

insurance coverage through a collection of roughly 250 health care plans (primarily

797833.1

preferred provider organizations, HMOs, and high-deductible insurance plans) for more than 8 million federal employees and retirees, as well as their dependents and survivors.  The FEHBP is funded by the federal government and administered by the United States Office of Personnel Management.  MBS submits claims to the specific FEHBP health care plans.

43.

In addition, there are a number of other health care and health insurance programs which are funded, in whole or in part, by the federal government or the states of Florida, Georgia, New York, Texas, and Tennessee, to which MBS submit claims.

## CODING REQUIREMENTS

### Importance of Diagnosis and Procedure Codes

44.

While the Government Health Care Programs at issue in this case may have different procedural requirements for the submission of claims by medical providers, they all require claims to contain truthful and accurate diagnosis and procedure codes.  Among other uses, these codes are vital to each program's ability enforce its coverage rules.

45.

Medicare Part B (the largest Government Health Care Program at issue in this action) provides a representative example of these programs' reliance on truthful and accurate diagnosis and procedure coding to effectuate their coverage limitations.  While Part B pays for a broad range of medical treatments, it only covers medical care that is "reasonable and necessary for the diagnosis or treatment of injury or illness . . . ."  42 U.S.C. § 1395y(a)(1)(A).  As a result, under Part B all coverage for any medical procedure is limited to specific diagnoses that a particular procedure is known to treat.  Moreover, as a means of controlling program costs, Medicare Part B has adopted detailed rules excluding coverage for specific categories of medical care unless it is provided to treat particular diagnoses (*e.g.*, cosmetic surgery is excluded unless it is undertaken to correct damage from an accidental injury).  Given the centrality of both procedure and diagnosis information to Part B's coverage regime, the program understandably requires and expects that all claims submitted by providers will contain truthful and accurate procedure and diagnosis codes.

**Requirement of Accurate Diagnosis and Procedure Codes**

46.

In order to implement Medicare Part B's coverage restrictions, all claims for

physician services since 1989 have had to include "appropriate diagnostic coding

for those services using ICD-9-CM," which is a standardized set of diagnosis codes

formally known as the *International Classification of Diseases*, Ninth Edition,

Clinical Modification.  *See* 42 C.F.R. § 424.32(a)(2); *see also* 42 U.S.C. §

1395u(p)(1).  Pursuant to this requirement, physicians submitting Medicare claims

are expected to "[a]ssign an ICD-9-CM code that provides the highest degree of

accuracy and completeness."  CMS Program Memorandum, Tr. B-03-046, p.3

(Jun. 10, 2003) (available at

http://www.cms.gov/Transmittals/Downloads/b03046.pdf).

47.

The Medicare program similarly requires that all Part B claims identify

medical services with a standardized set of procedure codes known as the *Current

Procedure Terminology* (CPT codes).  45 C.F.R. §162.1002(b)(1).  CPT codes

comprise a subset of Medicare's *Healthcare Common Procedure Coding System*

(HCPCS codes), which also includes non-CPT codes for medical products and

supplies.  HCPCS codes correlate to Medicare's Physician Fee Schedule and

thereby control the amount of Medicare reimbursement received for the care

provided.

797833.1

48.

Before Medicare will pay a claim pursuant to its Physician Fee Schedule, it

determines whether the ICD-9-CM diagnosis code and the HCPCS procedure code

on the claim correlate, meaning that the listed procedure is a covered treatment for

the identified diagnosis.  This dual assessment of both the ICD-9-CM and HCPCS

codes is one of the chief mechanisms by which the Medicare program enforces its

coverage restrictions.

49.

Because ICD-9-CM diagnosis codes and HCPCS procedure codes are used

to determine whether specific services are covered by the Medicare program, use

of truthful and accurate diagnosis codes on Part B claims is a condition of

Medicare payment for those services.  *See, e.g.*, 42 U.S.C. § 1395u(p)(1)

(conditioning payment on use of "appropriate diagnosis codes").

50.

The importance of truthful coding is further emphasized by Part B's claim

form itself.  Medicare Part B claims are submitted on Form CMS 1500 or its

electronic equivalent, 42 U.S.C. §1395w-4(g)(4)(A)(i); 42 C.F.R. § 424.32(b), (d),

which requires physicians to certify that the information provided on the claim "is

true, accurate and complete," and "that the services listed" on the claim "were

797833.1

29

medically indicated and necessary to the health of the patient." *See also* 43 Fed. Reg. 45175 (Sept. 29, 1978).

51.

All Government Health Care Programs at issue in this action have adopted diagnosis and procedure coding requirements that are materially similar to those employed by Medicare Part B.

**MBS'S FALSE CLAIMS
AND FRAUDULENT ACTIVITIES**

52.

MBS has engaged in the following course of misconduct to encourage, direct, and conceal its fraudulent and illegal billing practices: (1) adopting internal operating procedures designed to maximize the company's revenues through, *inter alia*, the falsification and resubmission of properly denied claims; (2) directing MBS employees to falsify diagnosis codes on large collections of denied claims without any access or reference to patient medical information; and (3) refusing to adopt basic, common, and well-known compliance measures that would likely detect, expose, and terminate its fraudulent coding practices and scheme to submit falsified medical claims.

797833.1

# MBS DEVISED ITS PROCEDURES TO CAUSE THE FALSIFICATION AND RESUBMISSION OF PROPERLY DENIED CLAIMS

53.

MBS has designed and implemented its billing procedures to maximize its revenues through the falsification and resubmission of properly denied claims, circumventing coverage restrictions imposed by Government Health Care Programs and other third-party payers.

## MBS's Abusive Billing Practices Are the Predictable Result of its Percentage-Based Contracts

54.

MBS is motivated to falsify medical claims because its compensation is based, at least in part, on a percentage of the revenue it collects on behalf of its clients.

55.

During Vaughn's initial training at MBS in mid-2009, she was provided an overview of MBS's business operations.  During this session, Vaughn and the other trainees were told that MBS is incentivized to collect as much as possible for its clients because the company's fees are partially based on the amount of revenue it collects on their behalf.

56.

In the year since Vaughn was hired at MBS, she has routinely heard her co-workers and managers reference MBS's percentage-based compensation arrangements with its clients, and she has seen numerous documents referencing MBS's percentage-based interest in its collections.  For instance, in October 2009, Frances Meadows (Vaughn's manager at the time and currently an MBS Director, a position reporting directly to the MBS Chief Operating Officer) remarked, in reference to a stack of denied claims, "[i]f these claims don't get paid, then MBS doesn't get paid."  In addition, Vaughn has seen MBS commissions referenced in numerous internal business reports—known as "Business Intelligence Dashboard" reports—which are accessible to all MBS employees using their MED/FM computer system identification.  Detailing the status of billing and collections for individual MBS clients, the one-page reports include a row of figures labeled "MTD [Month to Date] *Commissionable* deposit."  (emphasis added).

57.

The Department of Health and Human Services Office of Inspector General ("HHS-OIG") has long expressed its disfavor of percentage-based fee arrangements that provide billing companies with "an incentive to maximize" the revenue of medical practices.  *See, e.g.*, Office of Inspector General's *Compliance*

797833.1

32

*Program Guidance for Individual and Small Group Physician Practices*, 65 Fed.

Reg. 59,434, 59,447 (Oct. 5, 2000) (hereinafter "OIG Physician Practice

Guidance"); Office of Inspector General's *Compliance Program Guidance for

Third-Party Medical Billing Companies*, 63 Fed. Reg. 70138, n.40 (Dec. 18, 1998)

(hereinafter "OIG Billing Company Guidance"); Advisory Opinion 98-4 (Apr.

1998); Advisory Opinion 98-1 (Mar. 1998).  The HHS-OIG objects to these

arrangements because they inherently provide an incentive for billing companies to

maximize revenue through "intentional upcoding and similar abusive billing

practices."  OIG Physician Practice Guidance, 65 Fed. Reg. at 59,447; *see also*

OIG Billing Company Guidance, 63 Fed. Reg. 70138, n.40.

**MBS Only "Reviews" Diagnosis Codes**
**After Claims Are Initially Denied**

58.

MBS receives complete ICD-9-CM diagnosis codes for all claims with the

medical claim information it acquires from its client practices.  These diagnosis

codes are provided by the clinical staff inside either the client practices or the

hospitals in which they are based.

59.

While MBS converts, processes, and often corrects certain information in

this claim data (*e.g.*, revising demographic information or deleting duplicate

claims) before submitting the claims to the Emdeon medical claim processing

clearinghouse (which forwards them onto the ultimate payors), MBS makes no

effort to review or validate the diagnosis codes before they are first submitted for

payment. Thus, until a claim is denied on the basis that its listed procedure is not a

covered treatment for the identified diagnosis, MBS presumes that the original

diagnosis code provided by its client is wholly accurate.

60.

However, once a claim is denied and MBS faces the prospect of losing its

percentage-based fees from that claim, the company takes the approach that the

original diagnosis code is presumably inaccurate. The following MBS

instruction—which directs MBS employees on how to respond when a claim is

denied on the basis that its diagnosis code is inconsistent with its procedure code—

reflects the company's approach:

> Check HDC *[the "hospital data capture" module, where
> the original data and medical information was captured
> before being uploaded to the MED/FM system]* for a
> payable diagnosis, against any available LCD *[local
> coverage determination]*. If there is no different
> diagnosis, give the transcribed report [a report of the
> physician's dictation during the procedure, which is often
> not available] to a diagnosis coding specialist *[there are
> none at the Duluth operating center, where MBS employs*

34

*no certified coders]* to code all indicated diagnosis [sic].
After receiving back the coded reports, if available, use
the carrier LCD to choose the payable diagnosis from the
ones that are coded and put it in the first diagnosis
position on the charge.  If no LCD is available, put all
diagnosis [sic] coded on the charge.  Rebill as a corrected
claim, to the carrier."

MBS's Standard Operating Procedure, p.11 (distributed August 2010), attached

hereto as Exhibit A.

61.

While the procedure delineated above is not followed at MBS (because the

company currently employs no certified coders at its Duluth operations center and

provides no coding training to its employees), these instructions reveal that MBS's

true motive in changing diagnosis codes is to secure payment at the expense of

proper coding.

**MBS Directs Untrained Employees to
Find "Payable" Diagnosis Codes for Denied Claims**

62.

While MBS employs no certified coders at is Duluth operating center and

provides no training in accurate coding technique or medical terminology, it

mandates that each of its employees in the position of Account Representative II

(Vaughn's position) review any medical records available for denied claims to

797833.1

identify "payable" codes that can be used to replace the original code provided by the practice.

63.

Even worse, since December 2009, MBS has been outsourcing a portion of these coding tasks to the India office of an American-based outsourcing company, Technosoft Corporation.  On information and belief, Technosoft either does not employ or is not using, certified or trained coders to recode denied claims from MBS.  Vaughn's belief is based on her common and distressing experience of finding claims in the MED/FM computer systems that Technosoft has handled.  Frequently, these records reflect that a Technosoft employee has altered a diagnosis code on a denied claim without any supporting clinical medical information for the patient.

<h3 style="text-align:center">MBS Imposes Significant Pressure on<br>Employees to "Get Denied Claims Paid"</h3>

64.

MBS imposes significant pressure on its employees in the position of Account Representative II to get previously denied claims paid by any means available.  For the greater part of Vaughn's first year at the company, this pressure was exerted through a series of large Monday afternoon meetings attended by all

MBS employees in the position of Account Representative II. These meetings were led by Managers Frances Meadows and Leroy Young, who routinely and publicly criticized the representatives who they believed were not collecting a large enough percentage of their denied claims. More recently, managers have been meeting more privately with one or two of the Account Representative II's at a time. In the smaller meetings attended by Vaughn, the managers reviewed each representative's recent collections and stressed the importance of collecting a larger number of denied claims in a shorter period of time.

65.

While Vaughn's job has never been threatened in any of these settings, she recognizes that most of her former co-workers who have been promoted, actively participated in the scheme to falsify diagnosis codes, and she believes that engaging in this activity may be an indispensible requirement to achieving the results necessary for advancement at MBS.

**MBS MANAGERS ROUTINELY DIRECT
SUBORDINATES TO FALSIFY DIAGNOSIS CODES**

66.

Vaughn has personally been directed by MBS managers to improperly change diagnosis codes on denied claims presented to her in stacks, even after she

797833.1

cautioned each manager about her lack of training on, and experience with, medical coding issues and her lack of comfort with the assignments.  Importantly, on every occasion the managers expressed that changing the denied codes was not a difficult task and did not require accessing each patient's medical records.

67.

In October 2009, Frances Meadows, Vaughn's manager at the time, called Vaughn and her co-worker, Erica Williams, into her (Meadows') office and assigned both subordinates responsibility for changing diagnosis codes on dozens of denied claims.  Meadows explained that the process only involved (1) using a coding book to locate a similar diagnosis code corresponding to the claim's HCPCS procedure code that was covered by the payer in question, and (2) changing the diagnosis code on the claim accordingly.  After Vaughn attempted to avoid the assignment by explaining that she had no coding training or experience, Meadows crossly responded as follows:

> "You are going to need to get with the program.  These claims have to get paid.  If these claims don't get paid, then MBS doesn't get paid.  If MBS doesn't get paid, we don't get paid and are out of a job."

68.

To diffuse the tension created by Meadows' reaction, Williams volunteered to change the diagnosis codes on all the denied claims Meadows was attempting to

797833.1

38

assign to both Vaughn and Williams. Williams left the meeting with the stack of denied claims, and Vaughn later saw Williams working on the stack with the coding book. Shortly thereafter, Williams was promoted to a position in MBS's training department.

69.

Frances Meadows has since been promoted to the position of MBS Director, making her only one of four MBS executives to report directly to MBS's Chief Operating Officer.

70.

On July 23, 2010, Alicia Swancey, Vaughn's manager at the time, presented Vaughn with a stack of denied claims and directed her to change their diagnosis codes. When Vaughn asked how she was supposed to change the codes with no coding training or experience, Swancey responded by explaining that all Vaughn needed to do was use an ICD-9-CM reference handbook Swancey would provide her to identify a payable diagnosis code that is compatible with the HCPCS procedure code on each claim.

71.

The coding book Swancey identified is titled: "ICD-9-CM for Hospitals, Volumes 1, 2 & 3," which is published by Ingenix, a health care information

797833.1

subsidiary of UnitedHealth Group.  The book contains both diagnosis codes and procedure codes, and Vaughn has frequently seen this book being used by her co-workers throughout the Duluth operating center.

72.

In addition, Vaughn has been told directly by her supervisor, Sheila Milton, and has overheard Leroy Young (an MBS Manager) telling his subordinates, that diagnosis codes should be re-ordered on claims after the claims have been denied. According to both Milton and Young, the payers only evaluate the primary and secondary diagnosis codes when making coverage decisions, and the diagnoses listed by the physicians in the third, fourth, or fifth slots may render the claim payable if they were listed as the primary diagnosis.  These directives result in false and fraudulent claims.

73.

The Government Health Care Programs at issue in this action require providers to accurately sequence multiple diagnoses according to guidelines promulgated by CMS.  Thus, while Form CMS 1500 allows providers to identify multiple ICD-9 diagnosis codes associated with a CPT code, "the diagnosis, condition, problem, or other reason for encounter/visit shown in the medical record to be chiefly responsible for the outpatient services provided during the

797833.1

40

encounter/visit" should be coded first.  Centers for Medicare & Medicaid Servs.,

ICD-9-CM Official Guidelines for Coding and Reporting (2009), at 98.  The

importance of proper sequencing of diagnosis codes is reflected in the HHS-OIG

Billing Company Guidance, which identifies "proper . . . sequencing of diagnoses"

as a risk area to be addressed as part of coding and billing training.  OIG Billing

Company Guidance, 63 Fed. Reg. 70147.

74.

Courts have recognized the significance of providers accurately coding

multiple diagnoses when submitting claims to government programs.  One circuit

recently held that "submitting a fraudulent secondary diagnosis in order to receive

greater reimbursements" in the context of in-patient hospital services constituted a

false claim for purposes of the FCA.  *United States ex rel. Bledsoe v. Cmty. Health

Servs., Inc.*, 501 F.3d 493, 515 (6th Cir. 2007).  The government has also sued

Medicare providers to collect overpayments in instances where the provider

"improperly designated secondary diagnoses as primary diagnoses" to get claims

paid.  *See, e.g., United States v. Tenet Healthcare Corp.*, 343 F. Supp. 2d 922, 925

(C.D. Cal. 2004).

## MBS HAS CAUSED FALSE CLAIMS TO BE SUBMITTED
## AND PAID BY GOVERNMENT HEALTH CARE PROGRAMS

### 75.

As an Account Representative II, Vaughn routinely encounters denied claims that have been rejected and resubmitted by MBS multiple previous times. Often Vaughn notes that (1) the diagnosis codes on these claims have been changed by an MBS employee before a prior resubmission, and (2) MBS has no medical records regarding the claim, which the company would need to justify any alteration of the diagnosis code.

### 76.

Because Vaughn usually only works with denied claims in her position, she does not normally see how many similar falsified claims are ultimately paid. However, by searching MBS's MED/FM computer system, Vaughn has been able to identify the following examples of false claims submitted by MBS employees that have recently been paid by the Medicare program.

### False Claim Example No. 1
### (Paid by Medicare Advantage HMO on July 20, 2010)

### 77.

On July 20, 2010, Evercare (a Medicare Advantage HMO) paid a false claim that MBS submitted to the company with a falsified diagnosis code. The claim

involved medical care, an MRI (magnetic resonance imaging) of the lumbar with

contrast material (HCPCS 72158), provided on April 9, 2010 at Central Georgia

MRI, LLC, located in Macon, Georgia.  The diagnosis code originally provided on

the claim by the practice was ICD-9-CM 7295 (other soft tissue disorders, pain in

limb), and MBS originally submitted the claim to Evercare without evaluating or

altering the diagnosis code on April 17, 2010.  Evercare denied the claim on April

30, 2010 with the following notation: "level of service not substantiated," meaning

that the procedure was not a medically necessary treatment for the listed diagnosis.

On July 14, 2010, Tamica Belo—an MBS supervisor in the position of Team

Leader at the time, and since elevated to the position of Senior Associate—

changed the claim's diagnosis code to ICD-9-CM 75610 (anomaly of spine,

unspecified).  Importantly, MBS's MED/FM computer system had no clinical data

on the patient or the treatment to support MBS's alteration of the diagnosis code.

MBS resubmitted this claim with a falsified diagnosis code on July 15, 2010, and

Evercare paid $541.33 for the falsified claim on July 20, 2010.  *See*

HCCPHI000111-121, attached hereto as Exhibit B.

**False Claim Example No. 2**
**(Paid by Medicare on July 2, 2010)**

78.

On July 2, 2010, Medicare paid a false claim that MBS submitted to the program with a falsified diagnosis code. The claim involved medical care, a whole body PET (positron emission tomography) scan, provided on November 16, 2009 at Central Georgia P.E.T., LLC, located in Macon, Georgia. The diagnosis code originally provided on the claim by the practice was ICD-9-CM V1082 (personal history of malignant melanoma of skin), and MBS originally submitted the claim without evaluating or altering the diagnosis code to "BS of Georgia" (presumably "Blue Cross Blue Shield of Georgia"), which denied the claim on December 14, 2009. After receiving the denial, MBS changed the primary insurer to Medicare, and on March 5, 2010, Constance Armstrong—an MBS employee in the position of Account Representative II at the time, and since promoted twice to her current position as a full Manager—changed the diagnosis code to ICD-9-CM 56210 (diverticulosis of colon). MBS submitted this claim with a falsified diagnosis code to the Medicare contractor on March 6, 2010. Medicare denied the claim on May 18, 2010. On June 18, 2010, Tamica Belo—an MBS supervisor in the position of Team Leader at the time, and since elevated to the position of Senior Associate—

changed the claim's diagnosis code to ICD-9-CM 1729 (melanoma of skin, site

unspecified), and the claim was resubmitted to the Medicare contractor soon

thereafter.  Importantly, MBS's MED/FM computer system had no clinical data on

the patient or the treatment to support either of MBS's two diagnosis code

alterations.  Medicare paid $1,079.86 for the falsified claim on July 2, 2010.  *See*

HCCPHI000056-66, attached hereto as Exhibit C.

**False Claim Example No. 3**
**(Paid by Medicare on June 9, 2010)**

79.

On June 9, 2010, Medicare paid a false claim that MBS submitted to the

program with a falsified diagnosis code.  The claim involved medical care, a

duplex scan of extremity arteries (HCPCS 93923), provided on February 11, 2010

at St. Johns Radiology Associates, located in St. Augustine, Florida.  The diagnosis

code originally provided on the claim by the practice was ICD-9-CM 7295 (pain in

limb), and MBS originally submitted the claim to the Medicare contractor without

evaluating or altering the diagnosis code on March 12, 2010.  Medicare denied the

claim on March 18, 2010 with the following denial code and notation: "M25

LEVEL OF SRV NOT SUBSTANTIATED," meaning that the procedure was not

a medically necessary treatment for the listed diagnosis.  On May 26, 2010, an

MBS employee changed the claim's diagnosis code to ICD-9-CM 4439 (peripheral vascular disease, unspecified).  Importantly, MBS's MED/FM computer system had no clinical data on the patient or the treatment to support MBS's alteration of the diagnosis code.  MBS resubmitted this claim with a falsified diagnosis code on May 26, 2010, and Medicare paid a total of $26.17 for the falsified claim on June 9, 2010. *See* HCCPHI000221-236, attached hereto as Exhibit D.

### False Claim Example No. 4
### (Paid by Medicare on April 6, 2010)

80.

On April 6, 2010, Medicare paid a false claim that MBS submitted to the program with a falsified diagnosis code.  The claim involved medical care, an MRI (magnetic resonance imaging) of the lumbar with contrast material (HCPCS 72158), provided on December 22, 2009 at Diagnostic Imaging, P.A., located in Jacksonville, Florida.  The diagnosis code originally provided on the claim by the practice was ICD-9-CM 34831 (encephalopathy unspecified), and MBS originally submitted the claim to the Medicare contractor without evaluating or altering the diagnosis code on January 5, 2010.  Medicare denied the claim on January 8, 2010 with the following denial codes and notations: "N115 DECISION BASED ON LMRP," "DX INCONSISTENT WITH PR," and "LEVEL OF SEV NOT

SUBSTAN," all of which mean that the procedure was not a medically necessary treatment for the listed diagnosis.  On March 23, 2010, an MBS employee changed the claim's diagnosis code to ICD-9-CM 72402 (spinal stenosis, lumbar region). Importantly, MBS's MED/FM computer system had no clinical data on the patient or the treatment to support MBS's alteration of the diagnosis code.  MBS resubmitted this claim with a falsified diagnosis code on March 24, 2010, and Medicare paid $96.37 for the falsified claim on April 6, 2010.  *See* HCCPHI000067-82, attached hereto as Exhibit E.

### MBS PERPETUATES ITS FRAUDULENT PRACTICES BY REFUSING TO ADOPT COMMON, WELL-KNOWN COMPLIANCE MEASURES

81.

MBS shields and perpetuates its fraudulent billing practices by refusing to adopt rudimentary, common, and well-known compliance measures that would likely detect, expose, and terminate MBS's fraudulent coding practices and scheme to submit falsified medical claims.

82.

The basic elements of an effective medical billing company compliance program were delineated by the OIG in its *Billing Company Guidance*, which was released more than a decade ago.  63 Fed. Reg. 70138 (Dec. 18, 1998).

83.

However, MBS has intentionally disregarded the *OIG Billing Company Guidance* directives regarding the need to provide billing company employees adequate training and direction on compliance issues relevant to the industry, such as proper coding.  For example, MBS has made no effort to: (1) provide compliance instruction to newly hired employees as part of their initial orientation and job skills training; (2) make any copy of a written compliance manual available to the employees at its Duluth operations center; (3) develop any clear written compliance policies for coding, the medical billing industry's most significant compliance vulnerability (according to *OIG Billing Company Guidance*); or even (4) reference coding issues during in its annual, one-hour compliance training session for 2010.  MBS's conspicuous lack of meaningful compliance training and instruction is directly contrary to the *OIG Billing Company Guidance*, which states that "[t]raining and education programs for billing companies should be detailed and comprehensive.  They should cover specific billing and coding procedures, as well as the general areas of compliance." OIG Billing Company Guidance, 63 Fed. Reg. 70141 n.17.

84.

To Vaughn's knowledge, MBS does not engage in any of the following

basic fraud detection and mitigation activities: (1) compliance auditing or monitoring related to coding or any of the company's other fraud and abuse vulnerabilities; or (2) corrective or disciplinary action at its Duluth operations center to address compliance violations by its employees.  On information and belief, MBS engages in no compliance monitoring, auditing, or remedial actions whatsoever.  This conclusion is based on the ease to which any meaningful compliance auditing would reveal significant evidence of fraud and false claims, which would require a responsible company to take immediate remedial action observable to Vaughn and others within the company.

85.

MBS has failed to establish a minimally adequate system for its employees to convey their compliance questions and concerns.  To date the company has not adopted any of the following basic reporting measures: (1) a hotline (internal or external) for compliance questions or complaints; (2) any procedure whatsoever for anonymous reporting of compliance problems; (3) a policy assuring that employees will be safeguarded from workplace retribution for raising compliance concerns; or (4) a policy requiring all its employees to sign annual (or more frequent) compliance authentications.

86.

MBS's chief (and likely sole) compliance officer, Peggy McCloskey, resides in Florida and works at MBS's Coral Gables headquarters. As a result, she rarely visits the Duluth operations center. Moreover, McCloskey currently serves as interim Chief Operating Officer of MBS, an obvious and incurable conflict with her compliance responsibilities. In addition, although McCloskey was briefly identified by name during the new employee training Vaughn received when she was hired by MBS, Vaughn and her fellow trainees were not provided McCloskey's contact information nor were they provided information regarding what role, if any, MBS's compliance officer plays in the company.

87.

As described previously in this Complaint, MBS engages in "assumptive coding," which the HHS-OIG describes as "coding of a diagnosis or procedure without supporting clinical documentation." OIG Billing Company Guidance, 63 Fed. Reg. 70144 n. 49. MBS continues this fraudulent and illegal practice on a widespread basis, and the company has made no effort to control this pervasive and pernicious conduct, despite the HHS-OIG's warning more than a decade ago that assumptive coding is a serious risk area for medical billing companies. *See id.*

## COUNT I
## FEDERAL FALSE CLAIMS ACT
## (31 U.S.C. §§ 3729(a)(1)(A), (B) and (C)

### 88.

Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 87 of the Complaint.

### 89.

This is a claim for treble damages and penalties under the federal False Claims Act, 31 U.S.C. §§ 3729–3733, as amended.

### 90.

Defendant MBS, by and through its officers, agents, and employees, knowingly, or acting with deliberate ignorance or reckless disregard of the truth or falsity of the information at issue, presented or caused to be presented, false or fraudulent claims for payment or approval to the federal government or certain third-party recipients of federal money in violation of 31 U.S.C. § 3729(a)(1)(A).

### 91.

Defendant MBS, by and through its officers, agents, and employees, knowingly, or acting with deliberate ignorance or reckless disregard of the truth or falsity of the information at issue, made, used, or caused to be made or used, false

797833.1

records or statements material to a false or fraudulent claim in violation of 31
U.S.C. § 3729(a)(1)(B).

92.

Defendant MBS, by and through its officers, agents, and employees,
conspired with one or more of its 35 physician practice clients to violate 31 U.S.C.
§ 3729(a)(1)(A) and (B) in violation of 31 U.S.C. § 3729(a)(1)(C).

93.

Defendant MBS, by and through its officers, agents, and employees,
authorized, encouraged, and ratified the actions of its various officers, agents, and
employees to take the actions set forth above.

94.

As a result of Defendant MBS's acts, Government Health Care Programs
have paid claims for medical treatments that were not covered by those programs
or, but for MBS's submission of the false claims, would not have been paid.

95.

Each claim MBS has submitted to a Government Health Care Program that
includes a diagnosis code falsified by an MBS officer, agent, and employee
constitutes a false claim, unless the alteration was the result of a properly trained

MBS employee's thorough evaluation of a patient's medical record which fully supports the alteration.

96.

By reason of Defendant MBS's acts, the United States has been damaged, and continues to be damaged, in substantial amounts to be determined at trial. Government Health Care Programs have paid many claims submitted by MBS with falsified diagnosis codes.  These claims were a foreseeable and intended result of Defendant MBS's illegal acts.

97.

As set forth in the preceding paragraphs, Defendant MBS has knowingly violated 31 U.S.C. § 3729 *et seq.* and has thereby damaged the United States government by its actions in an amount to be determined at trial.

WHEREFORE, Relator, on behalf of herself and the United States government, prays that judgment be entered against Defendant and that forms of relief required by law and justice be awarded including:

> (a)    Judgment against Defendant in an amount equal to 3 times the amount of damages sustained by the United States government and federally funded health care programs (*e.g.*, Medicare, Medicaid, FEHBP, TRICARE, and CHAMPVA) because of its actions, plus

797833.1

53

a civil penalty of $5,500 to $11,000 for each violation of 31 U.S.C. § 3729, Relator's attorneys' fees and litigation expenses, and other costs of this action, with interest, including the costs of the United States government for its expenses related to this action;

(b)     An award to Relator in the event that the United States government continues to proceed with this action, of an amount for bringing this action in the amount of at least 15 percent of the proceeds of the action or settlement of the claims;

(c)     An award to Relator in the event that the United States government does not proceed with this action, in the amount of at least 25 percent of the proceeds of the action or settlement of the claims,

(d)     Trial by jury on all issues;

(e)     Relief to the United States government and Relator, both at law and at equity, to which they may reasonable appear entitled.

**COUNT II**
**FLORIDA FALSE CLAIMS ACT**

98.

Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 97 of the Complaint.

797833.1

99.

This is a *qui tam* action brought by Relator on behalf of the State of Florida

to recover treble damages and civil penalties under the Florida False Claims Act,

Fla. Stat. § 68.081 *et seq.*

100.

Fla. Stat. § 68.082(2) provides liability for any person who-

(a) Knowingly presents, or causes to be presented, to an officer or
employee of an agency a false or fraudulent claim for payment or
approval;

(b) Knowingly makes, uses, or causes to be made or used, a false
record or statement to get a false or fraudulent claim paid or approved
by an agency;

(c) Conspires to submit a false claim to an agency or to deceive an
agency for the purpose of getting a false or fraudulent claim allowed
or paid.

101.

Defendant violated Fla. Stat. § 68.082(2) and knowingly caused thousands

of false claims to be made, used, and presented to the State of Florida by its

deliberate and systematic violation of federal and state laws.

102.

The State of Florida, by and through the Florida Medicaid program and other state-funded health care programs, and unaware of Defendant's conduct, paid the claims Defendant submitted or caused to be submitted.

103.

Compliance with applicable Medicare, Medicaid, and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims Defendant submitted or caused to be submitted to the State of Florida.

104.

Had the State of Florida known that Defendant was violating the federal and state laws cited herein and/or that the claims Defendant submitted or caused to be submitted to the State of Florida failed to meet the reimbursement criteria of the Florida Medicaid program or other state-funded health care programs, it would not have paid those claims.

105.

As a result of Defendant's violations of Fla. Stat. § 68.082(2), the State of Florida has been damaged in an amount far in excess of a million dollars, exclusive of interest.

106.

Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, and she has brought this action pursuant to Fla. Stat. § 68.083(2) on behalf of herself and the State of Florida.

107.

This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Florida in the operation of its Medicaid program and/or other state-funded health care programs.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendant:

To the State of Florida:

    (1)    Three times the amount of actual damages which the State of Florida has sustained as a result of Defendant's conduct;

    (2)    A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant caused to be presented to the State of Florida;

    (3)    Prejudgment interest; and

    (4)    All costs incurred in bringing this action.

To Relator:

    (1)    The maximum amount allowed pursuant to Fla. Stat. § 68.085

797833.1

and/or any other applicable provision of law;

(2)     Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3)     An award of reasonable attorneys' fees and costs; and

(4)     Such further relief as this Court deems equitable and just.

## COUNT III
## GEORGIA FALSE MEDICAID CLAIMS ACT

108.

Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 107 of the Complaint.

109.

This is a *qui tam* action brought by Relator on behalf of the State of Georgia to recover treble damages and civil penalties under the Georgia False Medicaid Claims Act, O.C.G.A. § 49-4-168 *et seq.*

110.

O.C.G.A § 49-4-168.1 provides liability for any person who-

(a)(1) Knowingly presents, or causes to be presented, to the Georgia Medicaid program a false or fraudulent claim for payment or approval;

(a)(2) Knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Georgia Medicaid program;

(a)(3) Conspires to defraud the Georgia Medicaid program by getting a false or fraudulent claim allowed or paid;

### 111.

Defendant violated the Georgia False Medicaid Claims Act and other state-funded health care programs, knowingly caused thousands of false claims to be made, used, and presented to the State of Georgia by its deliberate and systematic violation of federal and state laws.

### 112.

The State of Georgia, by and through the Georgia Medicaid program and other state-funded healthcare programs, and unaware of Defendant's conduct, paid the claims Defendant submitted or caused to be submitted.

### 113.

Compliance with applicable Medicare, Medicaid, and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims Defendant submitted or caused to be submitted to the State of Georgia.

### 114.

Had the State of Georgia known that Defendant was violating the federal and state laws cited herein and/or that the claims Defendant submitted or caused to be submitted to the State of Georgia failed to meet the reimbursement criteria of

the Georgia Medicaid program or other state-funded health care programs, it would

not have paid those claims.

115.

As a result of Defendant's violations of the Georgia False Medicaid Claims

Act, the State of Georgia has been damaged in an amount in excess of a million

dollars, exclusive of interest.

116.

Relator is a private citizen with direct and independent knowledge of the

allegations of this Complaint, and she has brought this action pursuant to O.C.G.A.

§ 49-4-168.2(b) & (c) on behalf of herself and the State of Georgia.

117.

This Court is requested to accept pendant jurisdiction of this related state

claim as it is predicated upon the exact same facts as the federal claim, and merely

asserts separate damage to the State of Georgia in the operation of its Medicaid

program and/or other state-funded health care programs.

WHEREFORE, Relator respectfully requests this Court to award the

following damages to the following parties and against Defendant:

To the State of Georgia:

(1)    Three times the amount of damages which the Georgia

797833.1

> Medicaid program has sustained because of Defendant's conduct;

(2) A civil penalty of not less than $5,500 and not more than $11,000 for each false claim which Defendant caused to be presented to the State of Georgia;

(3) Prejudgment interest; and

(4) All costs incurred in bringing this action.

To Relator:

(1) The maximum amount allowed pursuant to O.C.G.A. § 49-4-168.2 and/or any other applicable provision of law;

(2) Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3) An award of reasonable attorneys' fees and costs; and

(4) Such further relief as this Court deems equitable and just.

## COUNT IV
## NEW YORK FALSE CLAIMS ACT

### 118.

Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 117 of the Complaint.

### 119.

This is a *qui tam* action brought by Relator on behalf of the State of New York to recover treble damages and civil penalties under the New York False

797833.1

Claims Act, N.Y. State Fin. Law § 187, *et seq.*

Section 189 provides liability for any person who:

> 1.( a) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;
>
> 1.(b ) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;
>
> 1. (c) conspires to commit a violation of paragraph (a), (b), (d), (e), (f) or (g) of this subdivision.

120.

Defendant furthermore violated, N.Y. State Fin. Law § 189 and knowingly caused thousands of false claims to be made, used, and presented to the State of New York by its deliberate and systematic violation of federal and state laws.

121.

The State of New York, by and through the New York Medicaid program and other state-funded health care programs, and unaware of Defendant's conduct, paid the claims Defendant submitted or caused to be submitted.

122.

Compliance with applicable Medicare, Medicaid, and the various other federal and state laws cited herein was an implied, and upon information and belief,

797833.1

also an express condition of payment of claims Defendant submitted or caused to be
submitted to the State of New York.

123.

Had the State of New York known that Defendant was violating the federal
and state laws cited herein and/or that the claims Defendant submitted or caused to
be submitted to the State of New York failed to meet the reimbursement criteria of
the New York Medicaid program or other state-funded health care programs, it
would not have paid those claims.

124.

As a result of Defendant's violations of N.Y. State Fin. Law § 189, the State
of New York has been damaged in an amount in excess of a million dollars,
exclusive of interest.

125.

Relator is a private citizen with direct and independent knowledge of the
allegations of this Complaint, and she has brought this action pursuant to N.Y. State
Fin. Law § 189, on behalf of herself and the State of New York.

126.

This Court is requested to accept pendant jurisdiction of this related state
claim as it is predicated upon the exact same facts as the federal claim, and merely

797833.1

asserts separate damage to the State of New York in the operation of its Medicaid program and/or other state-funded health care programs.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendant:

To the State of New York:

(1)   Three times the amount of actual damages which the State of New York has sustained as a result of Defendant's conduct;

(2)   A civil penalty of not less than $6,000 and not more than $12,000 for each false claim which Defendant caused to be presented to the State of New York;

(3)   Prejudgment interest; and

(4)   All costs incurred in bringing this action.

To Relator:

(1)   The maximum amount allowed pursuant to N.Y. State Fin. Law § 189, and/or any other applicable provision of law;

(2)   Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3)   An award of reasonable attorneys' fees and costs; and

(4)   Such further relief as this Court deems equitable and just.

## COUNT V
## TENNESSEE MEDICAID FALSE CLAIMS ACT

### 127.

Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 126 of the Complaint.

### 128.

This is a *qui tam* action brought by Relator on behalf of the State of Tennessee to recover treble damages and civil penalties under the Tennessee Medicaid False Claims Act, Tenn. Code Ann. § 71-5-181 *et seq.*

### 129.

§ 71-5-182(a)(1) provides liability for any person who-

(A) Presents, or causes to be presented to the state, a claim for payment under the Medicaid program knowing such claim is false or fraudulent;

(B) Makes or uses, or causes to be made or used, a record or statement to get a false or fraudulent claim under the Medicaid program paid for or approved by the state knowing such record or statement is false;

(C) Conspires to defraud the State by getting a claim allowed or paid under the Medicaid program knowing such claim is false or fraudulent.

### 130.

Defendant violated Tenn. Code Ann. § 71-5-182(a)(1) and knowingly caused thousands of false claims to be made, used, and presented to the State of

797833.1

Tennessee by its deliberate and systematic violation of federal and state laws.

131.

The State of Tennessee, by and through the Tennessee Medicaid program and other state-funded healthcare programs, and unaware of Defendant's conduct, paid the claims Defendant submitted or caused to be submitted.

132.

Compliance with applicable Medicare, Medicaid, and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims Defendant submitted or caused to be submitted to the State of Tennessee.

133.

Had the State of Tennessee known that Defendant was violating the federal and state laws cited herein and/or that the claims Defendant submitted or caused to be submitted to the State of Tennessee failed to meet the reimbursement criteria of the Tennessee Medicaid program or other state-funded health care programs, it would not have paid those claims.

134.

As a result of Defendant's violations of Tenn. Code Ann. § 71-5-182(a)(1), the State of Tennessee has been damaged in an amount in excess of a million

797833.1

dollars, exclusive of interest.

135.

Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, and she has brought this action pursuant to Tenn. Code Ann. § 71-5-183(b)(1) on behalf of herself and the State of Tennessee.

136.

This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Tennessee in the operation of its Medicaid program.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendant:

To the State of Tennessee:

(1)   Three times the amount of actual damages which the State of Tennessee has sustained as a result of Defendant's conduct;

(2)   A civil penalty of not less than $5,000 and not more than $25,000 for each false claim which Defendant caused to be presented to the State of Tennessee;

(3)   Prejudgment interest; and

(4)   All costs incurred in bringing this action.

To Relator:

797833.1

(1)    The maximum amount allowed pursuant to Tenn. Code Ann. § 71-5-183(c) and/or any other applicable provision of law;

(2)    Reimbursement for reasonable expenses which Relator incurred in connection with this action;

(3)    An award of reasonable attorneys' fees and costs; and

(4)    Such further relief as this Court deems equitable and just.

## COUNT VI
## TEXAS FALSE CLAIMS ACT

### 137.

Plaintiff realleges and incorporates by reference the allegations contained in paragraphs 1 through 136 of the Complaint.

### 138.

Plaintiff repeats and realleges each allegation contained in paragraphs 1 through 84 above as if fully set forth herein.

### 139.

This is a *qui tam* action brought by Relator on behalf of the State of Texas to recover double damages and civil penalties under V.T.C.A. Hum. Res. Code § 36.001 *et seq.*

### 140.

V.T.C.A. Hum. Res. Code § 36.002 provides liability for any person who-

(1)    knowingly makes or causes to be made a false statement or misrepresentation of a material fact to permit a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is authorized;

(2)    knowingly conceals or fails to disclose information that permits a person to receive a benefit or payment under the Medicaid program that is not authorized or that is greater than the benefit or payment that is being authorized;

* * * *

(4)    knowingly makes, causes to be made, induces, or seeks to induce the making of a false statement or misrepresentation of material fact concerning:

* * * *

(B)    information required to be provided by a federal or state law, rule, regulation, or provider agreement pertaining to the Medicaid program;

(5)    except as authorized under the Medicaid program, knowingly pays, charges, solicits, accepts, or receives, in addition to an amount paid under the Medicaid program, a gift, money, a donation, or other consideration as a condition to the provision of a service or product or the continued provision of a service or product if the cost of the service or product is paid for, in whole or in part, under the Medicaid program.

141.

Defendant violated V.T.C.A. Hum. Res. Code § 36.002 and knowingly caused thousands of false claims to be made, used, and presented to the State of Texas by its deliberate and systematic violation of federal and state laws.

797833.1

142.

The State of Texas, by and through the Texas Medicaid program and other state-funded healthcare programs, and unaware of Defendant's conduct, paid the claims Defendant submitted or caused to be submitted.

143.

Compliance with applicable Medicare, Medicaid, and the various other federal and state laws cited herein was an implied, and upon information and belief, also an express condition of payment of claims Defendant submitted or caused to be submitted to the State of Texas.

144.

Had the State of Texas known that Defendant was violating the federal and state laws cited herein and/or that the claims Defendant submitted or caused to be submitted to the State of Texas failed to meet the reimbursement criteria of the Texas Medicaid program or other state-funded health care programs, it would not have paid those claims.

145.

As a result of Defendant's violations of V.T.C.A. Hum. Res. Code § 36.002, the State of Texas as has been damaged in an amount in excess of a million dollars, exclusive of interest.

797833.1

146.

Defendant did not, within 30 days after it first obtained information as to such violations, furnish such information to officials of the State responsible for investigating false claims violations, did not otherwise fully cooperate with any investigation of the violations, and have not otherwise furnished information to the State regarding the claims for reimbursement at issue.

147.

Relator is a private citizen with direct and independent knowledge of the allegations of this Complaint, and she has brought this action pursuant to V.T.C.A. Hum. Res. Code § 36.101 on behalf of herself and the State of Texas.

148.

This Court is requested to accept pendant jurisdiction of this related state claim as it is predicated upon the exact same facts as the federal claim, and merely asserts separate damage to the State of Texas in the operation of its Medicaid program and/or other state-funded health care programs.

WHEREFORE, Relator respectfully requests this Court to award the following damages to the following parties and against Defendant:

To the State of Texas:

    (1)   Two times the amount of actual damages which the State of Texas has sustained as a result of Defendant's conduct;

    (2)    A civil penalty of not less than $10,000 pursuant to V.T.C.A. Hum. Res. Code § 36.052(a)(3) for each false claim which Defendant cause to be presented to the state of Texas;

    (3)    Prejudgment interest; and

    (4)    All costs incurred in bringing this action.

To Relator:

    (1)    The maximum amount allowed pursuant to V.T.C.A. Hum. Res. Code § 36.110, and/or any other applicable provision of law;

    (2)    Reimbursement for reasonable expenses which Relator incurred in connection with this action;

    (3)    An award of reasonable attorneys' fees and costs; and

    (4)    Such further relief as this Court deems equitable and just.

Respectfully submitted, this 14th day of September, 2010.


*Ben E. Fox*

John E. Floyd
Georgia Bar No. 266413
Ben E. Fox
Georgia Bar No. 329427
John H. Rains IV
Georgia Bar No. 556052
Bret R. Hobson
Georgia Bar No. 882520

**BONDURANT, MIXSON &
ELMORE, LLP**
1201 W. Peachtree Street, NW,
Suite 3900
Atlanta, Georgia  30309
(404) 881-4100 (phone)
(404) 881-4111 (fax)


Page A. Pate
Georgia Bar No. 565899
Bernard S. Brody
Georgia Bar No. 084221
Jess B. Johnson
Georgia Bar No. 322066

**PATE & BRODY, LLP**
101 Marietta Street, Suite 3300
Atlanta, Georgia  30303
(404) 223-3310 (phone)


*Jennifer Auer Jordan*

Jennifer Auer Jordan
Georgia Bar No. 027857

**BIRD LAW GROUP, P.C.**
2170 Defoor Hills Road
Atlanta, Georgia  30318
(404) 647-0324 (phone)
(404) 872-3745 (fax)


*ATTORNEYS FOR RELATOR*

797833.1

## CERTIFICATION

The above-signed counsel hereby certifies that this Complaint has been
prepared pursuant to the formatting requirements of Local Rules 5.1 and 7.1,
utilizing Times New Roman, font size 14.

Ben E. Fox
Georgia Bar No. 329427